101 F.Supp.2d 1066 (2000)
Donald MALEC, Plaintiff,
v.
Richard D. KLATZCO, individually and as Chief of Police for the Village of Oak Brook, Illinois, Allen W. Pisarek, individually and as Chief of Police for the Village of Oak Brook, Illinois, Stephen B. Veitch, individually and as Village Manager for the Village of Oak Brook, Illinois, and the Village of Oak Brook, a municipal corporation, Defendants.
No. 97 C 7877.
United States District Court, N.D. Illinois, Eastern Division.
July 5, 2000.
*1067 Kenneth A. Jatczak, John P. DeRose, Anthony T. Capua, John P. DeRose & Associates, Hinsdale, IL, for Donald E. Malec, plaintiffs.
Richard T. Ryan, Mark F. Smolens, Richard L. Jones, John Patrick Cleary, Ryan, Smolens & Jones, Chicago, IL, for K. Sue Sanford, John Barr, Daniel P. Letizia, individually and as members of the Board of Fire and Police Commissioners for the Village of Oak Brook, Illinois, Richard D. Klatzco, individually and as Chief of Police for the Village of Oak Brook, Illinois, Allen W. Pisarek, individually and as Chief of Police for the Village of Oak Brook, Illinois, Village of Oak Brook, a municipal corporation, defendants.

MEMORANDUM OPINION AND ORDER
CASTILLO, District Judge.
Donald Malec, a former Village of Oak Brook police officer, originally filed three claims against seven defendants, the Village and six of its officials, claiming that Defendants discriminated against him in his employment because of his disability in violation of the Americans with Disabilities Act (ADA); denied him his due process right; and violated his free speech rights under the First Amendment. In his complaint Malec alleges that he experienced adverse employment conditions in the form of suspensions, failure to promote, investigations, removal from active duty, and ultimately, termination, all as a result of his purported whistleblowing activities and his alcoholism. In addition, Malec claims that due process was denied him in the administration of these adverse employment actions. We previously dismissed Malec's claims regarding his termination from the police force. Malec v. Sanford, No. 97 C 7877, 1999 WL 183770 (N.D.Ill. Mar.25, *1068 1999) (Malec I). Subsequently, on March 7, 2000, we granted summary judgment in favor of the three defendants who were members of the Police Board. Malec v. Sanford, 191 F.R.D. 581 (N.D.Ill.2000) (Malec II). After Malec II, the surviving claims are against Defendants former Chief of Police Richard D. Klatzco, Chief Allen W. Pisarek, Village Manager Stephen B. Veitch, and the Village of Oak Brook. Presently before this Court is a summary judgment motion by the four remaining defendants. Defendants argue that Malec cannot, as matter of law, succeed on any of his three claims because he has not produced sufficient evidence such that a reasonable jury could return a verdict for him. We conclude that Malec has not met his burden with respect to any of his three claims, and grant summary judgment in favor of Klatzco, Pisarek, Veitch, and the Village of Oak Brook.

MATERIAL FACTS
We review the evidence according to the accepted standards of summary judgment and consider the evidence in the light most favorable to Malec, drawing all reasonable inferences in his favor.
Malec joined the Village of Oak Brook Police Department ("the Department") as an officer in January 1979. In April 1988, Malec was granted a non-duty related disability pension based on "mental stress and alcoholism" but returned to duty in October 1994. On November 8, 1995, Malec recovered two parking tickets from a garbage bag disposed of in a dumpster behind the police station. Malec linked these tickets to Sergeant Marc DeLise, who had been seen by another officer, Roy Lancor, placing the garbage bag in the dumpster, and whose name appeared on other items contained in the bag. Malec informed Sergeant Louis Hayes of his discovery and subsequently placed copies of the tickets along with an anonymous memorandum in Hayes's locker for the purpose of exposing what Malec believed was DeLise's wrongdoing. On December 3, 1995, Hayes delivered the evidence to then-Chief of Police James Fleming. Two days later, Fleming and Village Manager Stephen Veitch opened the envelope and first learned of the possible irregularities regarding parking tickets. Malec was subsequently ordered to turn over whatever evidence was in his possession, but he believed the order to be unlawful and reported the incident to Fire and Police Commissioner John Craig. Additionally, Malec sought further guidance from Detective Michael King, whereupon King contacted the DuPage County State's Attorney's Office. On December 20, Malec turned over all evidence in his possession to the DuPage State's Attorney's Office pursuant to a grand jury subpoena.
Sometime shortly after December 28, 1995, Malec and Lancor found cheese and toy rats in their lockers, ostensibly implying that Malec and Lancor were "rats" for exposing the possible corruption. In January 1996, the local press began to cover a DuPage County investigation into various allegations of corruption in the Department, including protection of prostitution, extortion, and ticket fixing. Chief Fleming resigned and Allen Pisarek became Acting Chief on January 15, 1996. The next day, President Bushy and Village Manager Veitch announced that Malec and Lancor were being transferred to the Detective Division to avoid further harassment. On January 17, the Illinois State Police Division of Internal Investigations took over the investigation of the Department. Approximately seven months later, on August 20, the Illinois State Police concluded their investigation without bringing any criminal charges.
In the meantime, Richard Klatzco became Interim Chief of Police on February 15, 1996, replacing Pisarek. The only information Bushy and Veitch gave Klatzco about the investigation was that Malec and Lancor had found "irregularities" and brought them to the attention of the DuPage State's Attorney. Klatzco was also advised by Pisarek that there had been a *1069 complaint of sexual harassment against Malec registered a few days earlier and that an internal investigation was being conducted. In May 1996, Malec was interrogated regarding the harassment charges leveled against him; he did not deny the factual basis for the complaint. As a result, Malec was suspended in June for three days for violating Department policies regarding sexual harassment. Also in June 1996, Malec was suspended for insubordination. Malec did not appeal either of these suspensions.
In October 1996, following an incident at roll call, Malec was removed from his position of Assistant Shift Commander. Malec did file a grievance in connection to this "demotion," but it was denied. In April 1997, the Board of Fire and Police Commissioners passed over Malec for a promotion to the rank of Sergeant, even though he had ranked first on the promotional exam. Malec filed an appeal of this decision to the Board on May 8, 1997, but the Board denied a hearing on the appeal. He was again denied the promotion in June 1997. Malec was suspended for the final time in July 1997 for filing a false report and conduct unbecoming an officer following an incident in which he used a mobile data unit to run a registration check on another officer's personal car and then lied about the incident. Malec believes each of these adverse employment decisions was retaliatory or discriminatory. Defendants, on the other hand, contend that Malec cannot demonstrate a link between the employment actions and either his disability or his speech, or that the reasons offered for the employment actions were pretextual.

SUMMARY JUDGMENT STANDARD
Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986). The court must view all evidence in the light most favorable to the nonmoving party and draw all inferences in the favor of that party. Id. at 255, 106 S.Ct. 2505. If the nonmoving party fails to sufficiently establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial, then summary judgment is proper. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Richards v. Combined Ins. Co. of Am., 55 F.3d 247, 251 (7th Cir.1995). Accordingly, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1003 (7th Cir.2000) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). It is not, however, the task of the Court to "scour the record" in search of a genuine issue for we rely on the nonmoving party to identify "with reasonable particularity" the evidence that militates against summary judgment. Richards, 55 F.3d at 251.

ANALYSIS
Apparently, Malec has abandoned his ADA and Due Process claims, as he offers no factual evidence or legal arguments in his response to Defendants' motion for summary judgment. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 n. 2 (7th Cir.1996). We must, however, examine the undisputed facts of the case to determine whether the two claims would fail as a matter of law. See Nabozny v. Podlesny, 92 F.3d 446, 457 n. 9 (7th Cir. 1996) (district court must examine facts to determine if granting Defendant's summary judgment on claim abandoned by Plaintiff is appropriate as a matter of law).
After confirming that Malec's ADA and due process claims fail as a matter of law, we turn to his First Amendment claims. A thorough review of the record reveals *1070 that Malec has produced no evidence from which a reasonable jury could conclude that the Department retaliated against him for his protected speech. Additionally, Malec has produced no evidence to support an independent claim against the Village.

A. Malec's ADA Claim
In his complaint, Malec claims that Defendants discriminated against him because of his disability of alcoholism. The Americans with Disabilities Act, 42 U.S.C. § 12112(a) prohibits discrimination against a qualified individual because of his disability. Assuming that, as an alcoholic, Malec is disabled under the ADA, he produces no evidence, direct or indirect, that his alcoholism played any role in the employment decisions of which he complains. Further, he produces absolutely no evidence that other employees who are not disabled experienced better treatment. He doesn't even establish that Defendants knew that he is a recovering alcoholic. We have thoroughly examined the evidence presented and find that Malec presents no facts supporting his contention that Klatzco, Pisarek, or Veitch took any adverse action against him because of his alcoholism, or that his alcoholism was a motivating factor in any employment decision.[1] Therefore, we grant summary judgment for Defendants on Malec's ADA claim.

B. Malec's Due Process Claim
In Malec II we concluded that Malec "waived his due process claim [against the first three defendants] by failing to present any evidence (or argument) that he had a protected interest that these defendants violated." Malec II, 191 F.R.D. at 589. We are not obligated to act as Malec's attorney and will not fashion an argument for him without so much as a hint about what factual and legal issues Malec wants to pursue. The Seventh Circuit has clearly stated that the Court "may properly depend upon counsel to appraise [it] of the issues for decision." Trnka v. Local Union No. 688, United Automobile, Aerospace & Agric. Implement Workers of Am., 30 F.3d 60, 63 (7th Cir.1994) (quotation omitted). We shall not conduct a due process analysis because, as in Malec II, Malec's "contentions are so opaque; we simply cannot discern what he is complaining about, what he believes he should have gotten (a hearing? an interview? the promotion?) and why." Malec II, 191 F.R.D. at 589 n. 4.[2] For the foregoing reasons, we grant Defendants' motion for summary judgment Malec's due process claim.

C. Malec's First Amendment Claims
Malec claims that Defendants took five separate employment actions against him in retaliation for his disclosing alleged corruption by Sergeant DeLise. To survive *1071 summary judgment on his First Amendment retaliation claim, Malec must demonstrate that his speech was constitutionally protected and that his conduct was a "substantial" or "motivating" factor in Defendants' employment actions. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Thomsen v. Romeis, 198 F.3d 1022, 1027 (7th Cir.2000). Essentially, Malec must show that Defendants would not have taken the challenged actions "but for" the constitutionally protected conduct. Thomsen, 198 F.3d at 1027. If Malec meets this burden, the burden shifts to Defendants to show that they would have taken the same actions absent Malec's protected speech. Mt. Healthy, 429 U.S. at 287, 97 S.Ct. 568; Thomsen, 198 F.3d at 1027.
Defendants stipulate for purposes of this motion that Malec can establish a genuine issue that his speech was constitutionally protected. Instead, Defendants maintain that Malec has not produced facts showing that his protected expression was a "substantial" or "motivating factor" in their employment decisions. (Defs.' Mem. Supp. Summ. J. at 5). We will now examine, in turn, each of the five adverse employment decisions to determine whether Malec's speech was a "substantial" or "motivating" factor in those decisions, and if so, whether Defendant's proffered reasons were legitimate or whether they were pretextual.[3]

1. Suspension for Sexual Harassment: June 1996
On January 23, 1996, Communications Operator Tracy Caslin reported to Sergeant Susan Srch that Malec had made a sexual remark to her seven months earlier. Srch reported the allegation to Pisarek, who later advised Klatzco that Caslin had made a complaint of sexual harassment and that an internal investigation was underway. Klatzco, Pisarek, Srch, and Caslin met, and Caslin advised Klatzco that in June 1995 Malec had entered the communications center and stated to her that "Usually on the midnight shift, the dispatcher gives the police officer a blow job." (R. 48, Defs.' 56.1(a)(3) Statement of Uncontested Facts (SOUF) at ¶ 75, Ex. E, Klatzco Dep., pp. 35-36). Malec was interrogated on May 3, 1996 and during that interrogation never denied making the alleged statement. Instead, he said, "it was not directed toward her in solicitation for sex." (R. 48, Defs.' 56.1(a)(3) (SOUF) at ¶ 89, Ex. J, Malec Formal Interrogation 5/3/96, p. 23). At that interrogation, Malec also offered the following defense: "that's a crude and vulgar statement that's common in police culture." (R. 48, Defs.' 56.1(a)(3) (SOUF) at ¶ 88, Ex. J, Malec Formal Interrogation 5/3/96, pp. 20-21). On June 26, 1996, Malec was suspended for three days for violation of Oak Brook's policy on sexual harassment.
Malec makes several points regarding the incident of sexual harassment and the subsequent suspension that resulted. First, Malec renews his contention that the language reported by Caslin was "commonplace and widespread throughout the department." (Pl.'s Resp. Mem. at 13). He then states that Caslin did not like him, and that she had never lodged a complaint *1072 against anyone else even though such language in the Department was commonplace. (R.54, Pl.'s 56.1(b)(3)(B) Statement of Facts (SOF) at ¶¶ 82-83, Pl.Ex. F, Caslin Dep., pp. 49-51, 94). On a more relevant note, Malec points out that Caslin's accusation was made seven months after the actual incident, in violation of Department policy requiring the prompt reporting of such incidents. (R.54, Pl.'s 56.1(b)(3)(B) SOF at ¶ 74, Pl.Ex. 44; Pl. Ex. 45, Art. IX. § 4, pp. 1336.1). Finally, Malec intimates that Caslin made her charge against him as part of an effort of retaliation that included her signing an open letter to the press, joining other officers in denying the corruption allegations. (Pl.'s Resp. Mem. at 3, 13; R.54, Pl.'s 56.1(b)(3)(B) SOF at ¶ 81, Pl.Ex. F, Caslin Dep., pp. 95-99, 113-119).
As to Malec's defense that such crass language was an accepted part of Department culture, we will not discuss the pernicious effects of sexual harassment in the workplace other than to say that the incident was completely inappropriate and, on the merits of the incident itself, an investigation and sanctions were warranted. If such a culture of harassment was indeed acceptable in the Department at the time Malec made the statement, it is entirely reasonable that Klatzco, as the new Chief of a department already under a cloud of investigation, would want to change that culture. Part of that change would include investigating serious allegations of sexual harassment and subsequently suspending those found to be guilty of such conduct.
In any event, Malec does not show that others in the Department made similarly offensive remarks with impunity, or that a comment such as his would have been acceptable but for the retaliatory sentiment against him within the Department.
Regarding Malec's contention that Caslin's report of the incident was somewhat belated, Malec does not show that the Department was precluded from conducting an investigation and imposing upon him a penalty at the close of that investigation, or that in similarly tardy complaints the Department refused to proceed because of tardiness. As for the charge that Caslin acted out of spite in reaction to Malec's role in exposing possible corruption in the Department, Caslin's motives in exposing Malec's sexual remarks are immaterial to the question of whether Defendants themselves retaliated against Malec. Malec has never denied making the remark to Caslin. Furthermore, Caslin's motives thus have nothing to do with the legitimate motives of Klatzco, Veitch, Pisarek, or the Village in conducting the investigation into Caslin's serious allegations and subsequently suspending him.
It is well established that "the mere fact that protected speech precedes an employment decision does not create the inference that the speech motivated the employment decision." Roberts v. Broski, 186 F.3d 990, 994 (7th Cir.1999) (quotation omitted). Malec has not established a genuine issue that his speech was a "substantial" or "motivating" factor in Defendants' decision to investigate and suspend him, so that a jury could reasonably link the protected speech and the adverse action. See Roberts, 186 F.3d at 995. Malec offers no evidence whatever that the investigation and his subsequent suspension in June 1996 were motivated by his revelation of DeLise's alleged corruption in December 1995. In fact, Malec offers only that Klatzco "believed that part of the hostility toward Malec occurred because Malec bypassed the Department and went straight to the State's Attorney's Office" and that when Malec complained of pressure being exerted upon him, Klatzco responded that Malec "did it to himself." (R.54, Pl.'s 56.1(b)(3)(B) SOF at ¶¶ 67-68, Pl.Ex. J, Klatzco Dep., pp. 56, 80; Pl.Ex. N, Veitch Dep., p. 27; Pl.Ex. 77 Malec Aff., ¶¶ 69-70). Malec attributes no similar statements to either Veitch or Pisarek, nor does he tell us when Klatzco made the statement or in what context.
Assuming that Klatzco indeed made these statements in the context of blaming *1073 Malec for needlessly alleging corruption within the Department, we can find no evidence that such thoughts were a substantial or motivating factor in suspending Malec for sexual harassment. The remarks themselves are not sufficient to prove a link between Klatzco's purported personal opinions and Malec's suspension, as "statements made by decision makers unrelated to the decisional process itself" do not suffice to satisfy the plaintiff's burden of showing that action was taken against him because of his speech. Nelms v. Modisett, 153 F.3d 815, 819 (7th Cir. 1998). Ultimately, Malec must "present more than mere speculation or conjecture to defeat a summary judgment motion." Sybron Transition Corp. v. Security Ins. Co. of Hartford, 107 F.3d 1250, 1254 (7th Cir.1997). Malec makes no showing that his protected speech was even a minimal factor in his suspension. See, e.g., Maarouf v. Walker Mfg. Co., 210 F.3d 750, 755 (7th Cir.2000). Likewise, Malec makes no showing that Defendants' contention that the suspension was legitimate is in fact pretextual. Malec's claim that his suspension for sexual harassment was a result of Defendants' retaliation thus fails.

2. Suspension for Insubordination: June 1996
There are conflicting accounts of what transpired between Malec and Klatzco prior to his suspension for insubordination. Klatzco claims that Malec was suspended for failing to heed direct orders from Klatzco instructing Malec not to meet with President Bushy without first advising Klatzco, in order to adhere to the chain of command. (R. 48, Defs.' 56.1(a)(3) SOUF at ¶¶ 93-94, Ex. E, Klatzco Dep., pp. 133-135, 225, Ex. G, Malec Dep., pp. 294-296, Ex. 29). Malec counters that he was never given a direct order from Klatzco that he could not talk to Bushy, but that he should merely keep Klatzco informed of what was discussed.[3] (R.54, Pl.'s 56.1(b)(3)(B) SOF at ¶ 93-94, Pl.'s Ex. 50, Pl.Ex. 51, Pl.Ex. 77, Malec Aff. at ¶ 78). Malec received a two-day suspension on June 26, 1996 for speaking with President Bushy without advising Klatzco. Malec did not appeal the suspension. Assuming that Malec's version is true, Malec fails to show that he indeed did keep Klatzco informed of his dealings with Bushy. The need for adhering to a chain of command within a police department must not be minimized, for "the Chief's interest in running his department efficiently and in maintaining order and discipline among the ranks" is crucial in law enforcement. Kokkinis, 185 F.3d at 846.
More fundamentally, as with the sexual harassment suspension, Malec makes no showing that his protected speech was a factor in Klatzco's decision to suspend Malec. It is quite a stretch to suggest that the statements made by Klatzco regarding Malec's protected speech, for which no date is given, is in any way connected to this disciplinary action. Even if it we accept that Klatzco disliked Malec, such animosity must be accompanied by evidence linking it to the injury. See O'Connor v. Chicago Transit Auth., 985 F.2d 1362, 1368 (7th Cir.1993). Malec makes no such showing. Furthermore, the suspension for insubordination came more than six months after Malec's initial report of possible corruption and five months after Klatzco became Chief. The time lapse between Malec's protected speech and the suspension "severely undercuts the weight we must otherwise attribute" to whether the speech was a motivating factor in the suspension. Id. at 1370; see also Filipovic v. K & R Express Sys., Inc., 176 F.3d 390, 399 (7th Cir.1999) (holding that a four month lapse between the protected activity and adverse employment action militated against a reasonable inference of causation). We therefore find *1074 that Malec has not met his burden of showing that his protected speech was a motivating factor in his suspension for insubordination.

3. Removal from Position of Assistant Shift Commander: October 1996
On April 5, 1996, Klatzco assigned Malec to the position of Assistant Shift Commander. On September 27, 1996 an incident occurred at roll call in which Shift Supervisor Sgt. Donald Shaw read Klatzco's press release regarding the closing of the Illinois State Police's corruption investigation. According to Malec's version of the events, Shaw directed a comment to Malec that "This matter should not have ever occurred in the first place. No one did anything wrong. The black cloud is now lifted. Does anyone have any comment?" (Pl.'s Resp. Mem. at 5; Pl.Ex. 70, Malec Grievance of 10/7/96). Malec answered that "This matter would never have occurred if the parking tickets had been handled properly in the first place." (Id.). Malec makes no mention of anything else that occurred, but Defendants claim that Malec slammed his chair and left roll call without being dismissed or receiving his duty assignment. (R. 57, Defs.' 56.1(a)(3) Resp. at ¶ 126). Klatzco removed Malec from the position of Assistant Shift Commander on October 2, 1996 as a result of the roll call incident. In October 1996 Malec filed a union grievance, which was determined by Veitch to be without merit.[4]
Malec's roll call allegations fail for several reasons. First and foremost, Malec makes no showing that Klatzco was motivated by anything other than Malec's inappropriate actions at roll call. Malec presents absolutely no evidence to contrast Defendants' assertion that he left roll call before being dismissed and receiving his assignment. It was quite reasonable for Klatzco to remove Malec from a position of authority in light of Malec's inability to control his temper. Police departments are charged with maintaining public safety and are given "more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer." Kokkinis, 185 F.3d at 845. Moreover, it is wholly implausible that Klatzco used the roll call incident to strip Malec of a position that Klatzco himself assigned to Malec after it was known that Malec had reported his corruption allegations. Second, as with the insubordination suspension, the demotion allegation fails due to the significant time lapse between Malec's speech in December 1995/January 1996 and the suspension in June 1996, especially considering the fact that Klatzco actually gave Malec the appointment during that time period. Therefore we grant summary judgment to Defendants on Malec's demotion claim.

4. Failure to Promote to Sergeant: April 1997
On April 30, 1997, the Board of Fire and Police Commissioners met to consider an appointment to fill a vacancy in the rank of sergeant. Even though Malec ranked first on the Sergeant's Promotional Eligibility List, the Board did not promote him. Malec appealed this decision on May 8 and the appeal was rejected as untimely. Malec was again passed over for promotion on June 5, 1997. Malec claims that the Board passed over him for promotion because Klatzco and Pisarek improperly dismissed his credentials and recommended other officers for the position.
This Court previously dismissed a First Amendment claim against three Board members because Malec produced "no evidence" that the Board knew of his involvement in exposing possible corruption within the Department. Malec II, 191 F.R.D. at 588. The Board members, who ultimately were the decisionmakers, produced *1075 sufficient evidence that they did not know of and did not consider Malec's protected speech in their deliberations. Id. Logically it follows that Malec can only be arguing that Klatzco and Pisarek are responsible for Malec not receiving his promotion because they lobbied against the promotion based on disciplinary actions that Malec contends were truly motivated by retaliatory intentions  that in fact Klatzco and Pisarek lied to the Board about his abilities because of his protected speech. Liability would be found if Malec could show that Defendants actually had such retaliatory motives and that they tainted the decision making process. See Hoffman v. MCA, Inc., 144 F.3d 1117, 1122 (7th Cir. 1998) (holding that for summary judgment, Court must assume that any discriminatory intent on the supervisor's part tainted the decisionmaker's decision, making the supervisor's remarks relevant to proving that the decisionmaker's decision was unlawful). Malec, however, has produced no evidence showing that retaliatory intent motivated Klatzco and Pisarek's recommendations to the Board.
Even if we believed that Klatzco and Pisarek were motivated by retaliation in their testimony to the Board, the Court has already found that Malec's negative history (two suspensions and the roll call incident demotion), upon which the Board based their decision, was legitimate and not the product of Defendants' retaliatory motives. Thus, the Board's independent decision not to promote Malec because of his disciplinary record precludes the possibility that improper motive by Defendants was a substantial factor in the decision not to promote Malec. We therefore grant summary judgment for Defendants on Malec's failure to promote claim.

5. Suspension for Filing False Report and Conduct Unbecoming an Officer
On April 15, 1997, Srch submitted a memorandum to Klatzco complaining that Malec had used a mobile data terminal in a squad car to run a registration check on her personal vehicle. In response to a Department inquiry Malec admitted in written memorandum dated June 2, 1997 that he had run the check in order to test the terminal and that Srch's car was the first one he saw in the parking lot of the police station. Srch asserts that at the time Malec did the check her car was at her home; Malec offers no evidence that this was not the case. Malec was suspended on July 1, 1997 for five days for filing a false report and for conduct unbecoming an officer. Malec appealed the suspension and a hearing was set, but was canceled after Klatzco removed Malec from active duty.
This allegation of retaliation suffers from the same fatal flaws as Malec's other allegations. Malec offers not a shred of proof that he was suspended for his protected speech rather than because he was caught lying to the Department. Furthermore, Srch's initial report of the mobile terminal check was in April 1997, more than a year after Malec's speech became well known within the Department. The significant passage of time alone severs any inference of a causal nexus between Malec's protected speech and his suspension for filing a false report. This allegation is without merit.
For the foregoing reasons, the claim against Klatzco, Pisarek, Veitch, and the Village on Malec's First Amendment claim is hereby dismissed and summary judgment granted for Defendants.

D. The Village of Oak Brook
Municipalities are not vicariously liable in litigation under § 1983. See Monell v. New York Dep't of Soc. Serv., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). That Klatzco was Chief of Police and Veitch is Village Manager does not affect application of the Monell principle. Taylor v. Carmouche, 214 F.3d 788, ___, 2000 WL 675312, at *2 (7th Cir.2000). Unless Oak Brook had a policy of retaliating *1076 against protected speech  and Malec makes no showing that it did  then Oak Brook cannot be liable. Taylor, 214 F.3d at 791. All claims against the Village of Oak Brook are therefore dismissed.

CONCLUSION
We want to stress that people who expose corruption within those institutions charged with the public trust should be commended and not subject to harassment because of their actions. Malec may well have had noble intentions in trying to root out corruption within the Department in December 1995. Yet Malec's good actions in 1995 did not create total immunity for any future misconduct on his part. Malec simply has presented no evidence that he was retaliated against in 1996 and 1997 because of what he exposed in 1995.
For the foregoing reasons, we grant the motion for summary judgment, (R. 46-1), in favor of Defendants Richard Klatzco, Stephen Veitch, Allen Pisarek, and the Village of Oak Brook in its entirety. Because no claims remain in this case, we instruct the Clerk of Court to enter final judgment in favor of all of the defendants and against the plaintiff pursuant to Federal Rule of Civil Procedure 58.
NOTES
[1] In fact, the only mention Malec makes of his alcoholism in any of his summary judgment submissions is in the most general terms. For example, Malec merely states that he "voluntarily admitted himself into the New Day Center for treatment of Alcoholism, a medical disease," in 1988, nearly eight years before the first instance of adverse action supposedly taken against him. (Pl.'s 56.1(b)(3)(B) Statement at ¶ 3.) Malec also mentions becoming an addiction counselor. (Id. at ¶¶ 4, 12.)
[2] What makes Malec's complete lack of an argument particularly egregious is that this Court laid out a comprehensive, point-by-point description of the appropriate procedures involved in submitting and responding to a motion for summary judgment in Malec II. We specifically instructed Malec that the nonmovant must use the fact section in the memorandum of law "to explicitly identify material factual disputes requiring a trial ... this section should recite only those facts relevant to the motion and those necessary for coherence." Malec II, 191 F.R.D. at 586. Obviously, not including any relevant facts does not a coherent argument make. Furthermore, this Court made a point of stating that an argument will be waived if it is not stated explicitly, "unless painfully obvious what is being argued." Id. Finally, Malec included in his 56.1(b)(3)(B) Statement completely irrelevant and presumptuous "facts" that served only to further obfuscate his argument and to convolute his case. (Pl.'s 56.1(b)(3)(B) Statement at ¶¶ 13-17, 91, 118, 137-139, 152, 154-155, 173).
[3] We must again reprimand Malec for the structure of his submissions to the Court. His Response Memorandum is thoroughly unhelpful. Malec spends a full five pages of his memorandum discussing the legal precedents in proving that his speech was protected and that it outweighed Defendants' interests, per Connick-Pickering. This was a waste of time and space considering that Defendants stipulated to the issue. More importantly, Malec spends only two pages discussing the purported retaliatory actions taken against him. (Pl.'s Resp. Mem. at 12-14). Additionally, Malec makes blanket accusations in his analysis of the retaliation claim without offering citations to any of his factual submissions, making the task of matching accusation to evidence quite cumbersome. This difficulty is compounded because in the fact section of his memorandum, Malec cites directly to the evidence as opposed to his 56.1 Statement of Facts, in direct opposition to our instruction in Malec II, 191 F.R.D. at 586.
[3] Although we can discern no difference between "advising" Klatzco that he was talking to Bushy and "informing" Klatzco of the same, Malec seems to think this matters and, therefore, we report the alleged distinction as set forth by Malec.
[4] Malec's memorandum does not cite any of his 56.1 submissions regarding the roll call incident, but does make a reference to his October grievance.